IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 4:19-cr-172-001 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | DEFENDANT'S MOTION FOR |
| | ) | DOWNWARD DEPARTURE/VARIANCE, |
| JESSICA RAE REZNICEK, | ) | SENTENCING MEMORANDUM, AND |
| | ) | BRIEF IN SUPPORT |
| Defendant. | ) | |

COMES NOW, the defendant, JESSICA RAE REZNICEK, through counsel, and hereby submits the following Motion for Downward Departure or Variance, Sentencing Memorandum, and Brief in Support for the upcoming sentencing on June 30, 2021.

## I.  Witnesses

Ms. Reznicek does not expect to call any witnesses at the sentencing hearing.

## II.  Exhibits

Ms. Reznicek has the following exhibit for the sentencing hearing:

Exhibit A: 50 Letters of Support

## III.  Issues

Ms. Reznicek requests this Court sentence her below the guideline range to a sentence of probation or time served with home confinement.  This sentence is appropriate in this case and will promote the sentencing factors outlined in 18 U.S.C. § 3553(a).  Such a sentence is fitting in light of Ms. Reznicek's confession, guilty plea, the nature and circumstances of the offense, her rehabilitation, and her devotion to a continued life of service to the community.

## A. MS. REZNICEK'S PSR FACTUAL AND GUIDELINE OBJECTIONS.

Ms. Reznicek acknowledges the wrongs she has done that have her before this Court, which is why she publicly confessed to the crime and pled guilty to the offense. Ms. Reznicek does have an objection to the guideline calculation and corresponding criminal history category with respect to the imposition of the terrorism enhancement in PSR ¶ 37, which is discussed further below. Ms. Reznicek also made a number of PSR objections to clarify the facts in this case. Defense counsel is aware that Fed. R. Crim. P. 32(i)(3)(B) requires a district court to make specific findings as to each controverted material fact in the PSR or to determine that no such finding is necessary because the controverted fact will not be taken into account in sentencing. There are also several objections to the facts that do not necessarily have to be resolved, but are not factually accurate and therefore Ms. Reznicek could not agree were true.

With regard to PSR ¶¶ 10-13, Ms. Reznicek objects to the inclusion of these paragraphs as the actions were not perpetrated by her and are therefore not relevant conduct. Ms. Reznicek confessed to the conduct she committed and there is no evidence to suggest she had any part of these previous actions. The government has also not provided any discovery to show these incidents are related to Ms. Reznicek. Her activity in the conspiracy began on election night, November 8, 2016.

Ms. Reznicek objects to the monetary total for the damage to equipment in PSR ¶ 14. The discovery provided seems to indicate the damage total for this offense was $834,046.03. Additionally, Ms. Reznicek objects that the materials constituted a "destructive device," as she has not received a report that concludes this.

With regard to PSR ¶ 15, Ms. Reznicek clarifies that the fluid leaking from the hole was not oil.

With regard to PSR ¶ 18, Ms. Reznicek clarifies that nitrogen was being run through the pipeline at that time for testing purposes, which is what was escaping from the pipeline. No oil was yet running out of the pipeline from North Dakota.

Ms. Reznicek objects to the relevance of the inclusion of PSR ¶ 20.

Ms. Reznicek objects to the amount of the loss in PSR ¶ 26, as the government has not yet provided documentation to substantiate those figures. Additionally, it is not clear which incidents are included in the figures listed. The breakdown Ms. Reznicek has received appears to cover PSR ¶¶ 10-19, 22-25, which totals $5,687,340.90. Ms. Reznicek objects to any amounts listed in the spreadsheet attributed to the conduct in PSR ¶¶ 10-13. The information in the spreadsheet provided appears to be wholly separate from the dollar amounts in PSR ¶ 26. To the extent that Energy Transfer Partners is attempting to attribute all costs regarding security for the tens of thousands of people who protested the Dakota Access Pipeline, Ms. Reznicek objects to that extrapolation.

With regard to PSR ¶ 27, in the second paragraph of page 22, the word "corporations" was omitted before the word "permission."

With regard to PSR ¶ 28, all of the items in the photographs on pages 26-27 were found in Ms. Montoya's room (Room G), with the exception of the Water Is Life sign, which was located in a common room of the house.

With regard to PSR ¶ 31, Ms. Reznicek objects to the restitution amount until such time as supporting evidence is provided. To the extent that Energy Transfer Partners is attempting to attribute all costs regarding security for the tens of thousands of people who protested the Dakota Access Pipeline, she objects to that extrapolation.

Ms. Reznicek objects that she should receive a criminal history point for the conviction in PSR ¶ 71. This offense is relevant conduct of the instant offense. *See* PSR ¶ 27. Without this point, PSR ¶ 73 would then be a criminal history score of two, but the Criminal History Category would remain a II.

With regard to PSR ¶ 84, Ms. Reznicek adds that since being vaccinated for COVID-19, she has been able to return to daily Mass at St. Ambrose Cathedral.

Ms. Reznicek objects to the conclusions in PSR ¶ 85, Footnote 9. The Catholic Worker Movement and the Des Moines Catholic Workers have a wide variety of beliefs and are diverse in how they do their work. Some of them are advocates, some protestors, some exclusively work with the homeless population. As indicated in PSR ¶ 84, Ms. Reznicek is now dedicated to a life of service, not activism.

Ms. Reznicek clarifies PSR ¶ 92. The sign referenced did not belong to Ms. Reznicek and she did not put up the sign. Ms. Reznicek took it upon herself to take the sign down.

Ms. Reznicek supplements PSR ¶ 114. While working at the Kids' Kitchen at Damiano Center, she worked to reduce childhood hunger and malnutrition by providing nutritious meals and nutrition education. The program is a nurturing and fun place for kids after school and in the summer.

Ms. Reznicek supplements PSR ¶ 115. Given the numerous letters in Exhibit A from the Sisters of St. Scholastica Monastery, we would ask the PSR include this information as verified. In addition to the work listed, the elderly Sisters would ask Ms. Reznicek to do various errands for them or help them in a variety of ways. They appreciated her willing and generous spirit. Ms. Reznicek also attended morning, afternoon, and evening prayer, and Mass every day. Her day would begin with silent prayer in the Eucharistic Chapel every morning at 6 am. She would

end her ministry day after Evening prayer at 6 pm.

In PSR ¶ 142(a)(1), Ms. Reznicek has not yet been provided with the evidence to support the financial loss figure listed.

Ms. Reznicek disputes the accuracy of PSR ¶ 142(a)(2)(C).  While Ms. Reznicek was aware her actions were illegal, there is no information that she was aware of the potential penalties she faced for committing the offense.  Ms. Reznicek objects that she has continued to engage in organizing acts of active resistance, civil disobedience, and protest while she has been on pretrial supervision. *See* Ex. A.  Ms. Reznicek has not engaged in any of those behaviors while on pretrial supervision.  Ms. Reznicek only came back to the Catholic Worker house in Des Moines from the monastery in Duluth due to the COVID-19 pandemic.  But for the pandemic, Ms. Reznicek would still be in Duluth, focusing on a life of service, and wishes to return there after her sentencing hearing.

**1. The Enhancement under USSG § 3A1.4(a) is Not Applicable in this Case.**

Ms. Reznicek objects to the terrorism enhancement under USSG § 3A1.4(a) in PSR ¶ 37. She also objects to her criminal history being enhanced in PSR ¶ 74 for this enhancement.  This enhancement increases the guideline range from 36 to 47 months to 210 to 240 months (the statutory maximum).

The definition of terrorism is found in 18 U.S.C. § 2332b(g)(5).  The guideline enhancement in § 3A1.4(a) was originally designed for actual terrorism and material support to terrorism.  While Ms. Reznicek's offense of conviction, 18 U.S.C. § 1366(a), is an enumerated offense in the terrorism statue, the conduct of Ms. Reznicek does not fulfill the first prong of the definition because it was not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. §

2332b(g)(5)(A).  Ms. Reznicek was not taking action, or retaliating, against the government, she was taking direct action against a private company.

In order for this enhancement to apply, the defendant must have the specific intent to commit the offense to influence or coerce the government. *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008); *United States v. Hassan*, 742 F.3d 104, 148–49 (4th Cir. 2014); *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014); *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014); *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009); *United States v. Alhaggagi*, 978 F.3d 693, 700 (9th Cir. 2020).

The appropriate focus thus is not "on the defendant, but on h[er] 'offense,' asking whether it was calculated, *i.e.*, planned—for whatever reason or motive—to achieve the stated object." *Alhaggagi*, 978 F.3d at 700 (quoting *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010)).  The stated object in this case would be the conspiracy to damage a private energy facility in order to stop the private company from constructing the pipeline.  The actions to stop the private company were not objectively done to influence or coerce the government. Governmental entities had failed to stop the construction of the pipeline and were no longer involved.  The sole target was Energy Transfer Partners.

The Ninth Circuit has held that "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence." *United States v. Jordan,* 256 F.3d 922, 926 (9th Cir. 2001) (citing *United States v. Hopper,* 177 F.3d 824, 833 (9th Cir. 1999)). *See also United States v. Thurston*, No. CR 06-60069-01-AA, 2007 WL 1500176, at *19 (D. Or. May 21, 2007), *aff'd sub nom.*; *United States v. Tubbs*, 290 F. App'x 66 (9th Cir. 2008); *Alhaggagi*, 978 F.3d at 700.  The district court in

*Ansberry* also applied the clear and convincing standard when making factual determinations as to whether the enhancement applied. *United States v. Ansberry*, 976 F.3d 1108, n.8 (10th Cir. 2020). The clear and convincing standard should apply to the facts produced at sentencing and the Court should decline to apply the terrorism enhancement.

The terrorism enhancement skews the guidelines exponentially upward and they are therefore disproportionate to the offense conduct. The Ninth Circuit identified several relevant factors when analyzing disproportionality, "These include: 1) whether "the enhanced sentence fall[s] within the maximum sentence for the crime alleged in the indictment"; 2) whether "the enhanced sentence negate[s] the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment"; 3) whether "the facts offered in support of the enhancement create new offenses requiring separate punishment"; 4) whether "the increase in sentence [is] based on the extent of a conspiracy"; 5) whether "the increase in the number of offense levels [is] less than or equal to four"; and (6) whether "the length of the enhanced sentence more than double[s] the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence." *Jordan,* 256 F.3d at 928 (quoting *United States v. Valensia,* 222 F.3d 1173, 1182 (9th Cir. 2000), *cert. granted, judgment vacated, and remanded by* 532 U.S. 901 (2001)).

When applying these disproportionality factors to Ms. Reznicek, it shows the top end of the enhanced guideline exceeds the statutory maximum sentence, the increase in offense level in Ms. Reznicek's PSR is much greater than four, and the guideline range is more than QUINTUPLED by this enhancement. For the actual conduct that Ms. Reznicek committed, the enhancement should not apply as it would have a disproportionate impact in this case.

Obviously, this enhancement is often used when a defendant is convicted of actual violent terrorism or material support to terrorism. In a majority of cases other than those, the § 3A1.4 enhancement was applied for directed attacks against the government. *See United States v. Haipe*, 769 F.3d 1189 (D.C. Cir. 2014) (kidnapping 16 civilians to influence the government); *United States v. Dye*, 538 F. App'x 654 (6th Cir. 2013) (firebombing city hall, which contained the court where he was a defendant in a criminal case); *United States v. Thomas*, 521 F. App'x 741 (11th Cir. 2013) (conspiracy to use explosives to attack a federal building with the target being federal agents); *United States v. Ortiz*, 525 F. App'x 41 (2d Cir. 2013) (FARC members who took a hostage in an attempt to overthrow the Columbian government); *United States v. Salim*, 690 F.3d 115 (2d Cir. 2012) (attempted murder of a federal corrections officer); *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010) (conspiracy to commit murder, kidnapping and maiming in India); *United States v. Hale*, 448 F.3d 971 (7th Cir. 2006) (white supremacist leader who conspired to murder a district court judge); *United States v. Harris*, 434 F.3d 767 (5th Cir. 2005) (using a Molotov cocktail to burn the government building that contained evidence against his father); *United States v. Dowell*, 430 F.3d 1100 (10th Cir. 2005 (set fire to an I.R.S. office building).

For the enhancement to apply, "the conduct retaliated against must objectively be government conduct." *United States v. Ansberry*, 976 F.3d 1108, 1112 (10th Cir. 2020). The Tenth Circuit determined the enhancement should not apply to *Ansberry* because there was no evidence to show his attempt to detonate a bomb in front of a police station was the defendant retaliating against objectively government conduct. *Id.* at 1129.

Discussion of whether USSG § 3A1.4 could be applied in conspiracy to commit arson and destruction of an energy facility occurred in a series of cases involving co-defendants in the

Ninth Circuit. A preliminary ruling occurred in *United States v. Thurston*, No. CR 06-60069-01-AA, 2007 WL 1500176 (D. Or. May 21, 2007), *aff'd sub nom.* There were also separate opinions in *United States v. Tubbs*, 290 F. App'x 66 (9th Cir. 2008) and *United States v. Paul*, 290 F. App'x 64 (9th Cir. 2008).

Further discussion involving the same group of defendants occurred in the appeal of *United States v. Tankersley*, 537 F.3d 1100 (9th Cir. 2008). Over the course of five years, as many as sixteen defendants damaged and destroyed both government and private property via arson as activists for the Earth Liberation Front and the Animal Liberation Front. *Id.* at 1103. In Tankersley's case this included the destruction of the headquarters building of a private timber company. *Id.* A ten-year investigation ensued and a break in the case only came when an informant provided information which led to the arrest of the defendants. All of the co-conspirator's admitted in their plea that "[t]he primary purposes of the conspiracy were to influence and affect the conduct of government, commerce, private business and others in the civilian population by means of force, violence, sabotage, destruction of property, intimidation and coercion, and by similar means to retaliate against the conduct of government, commerce and private business. To achieve these purposes, some of the conspirators committed and attempted to commit acts potentially dangerous to human life and property." *Id*. at n.13.

The Court did not find that the evidence presented by clear and convincing evidence showed Tankersley's arson "was calculated to retaliate against government conduct" because the action was against a private corporation. *Id*. at 1107. The court upwardly departed however, to "take into account the defendant's intent to frighten, intimidate, and coerce private individuals at U.S. Forest Industries through her actions." *Id*. at 1108. After the destruction of the headquarters building, the group sent a communique bragging about their destruction of the building that

caused forty to fifty firefighters to respond and said their actions were in retribution, was "payback and it is a warning, to all others responsible we do not sleep and we won't quit. For the future generations we will fight back." *Id.* at 1105. The court found this arson "was a significant event in the overall success of the eco-terrorists' endeavors to deliver their message of intimidation and retaliation" and "injecting fear into governmental and private entities" necessitating a need to deter the conduct. *Id.* at 1111, 1115. Because the terrorism enhancement applied to some of the co-conspirators for their destruction of government property, but not all of them, the court ultimately upwardly varied to even out the guidelines of all of the defendants, however it did not also increase Tankersley's criminal history category to VI. *Id.* at 1109, n.8.

It is clear from the statements and confessions of Ms. Reznicek and Ms. Montoya, that their criminal actions were done to stop the construction of the pipeline and not seeking to influence or retaliate against the government. *See* PSR ¶ 27. The actions taken by the two of them were towards a private company, Energy Transfer Partners, who was building the Dakota Access Pipeline. Ms. Reznicek certainly previously sought governmental intervention to stop the pipeline for many months through protests, attending hearings, and civil disobedience. When those efforts failed, she focused on stopping the construction and flow of oil through the pipeline. As they indicated in their confession, "our goal was to push this corporation beyond their means to eventually abandon the project." PSR ¶ 27. The government lists the victim in the case as Energy Transfer Partners; not a governmental entity. PSR ¶ 31. There is no evidence that Ms. Reznicek intended to frighten or intimidate anyone by her actions, or that it was retaliatory. Her singular focus was to stop oil from flowing through the pipeline. She did not threaten or brag about her conduct, and she ultimately confessed to her conduct to bring more attention to the potential dangers of the pipeline.

10

The terrorism adjustment is a draconian one-size-fits all increase lacking any empirical basis or ties to § 3553(a). *See* James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Inequality 51, 57-58, 108, 112-15 (2010).  Judge Breyer, acting chair of the Sentencing Commission, recognizes that guidelines "should be based, above all, on empirical data." *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1012 (N.D. Cal. 2019). He sets out in detail how the terrorism adjustment's automatic CHC VI is "inappropriate" because it is not tied to the seriousness of the offense and does not reflect empirical risk of recidivism. *Alhaggagi*, 372 F. Supp. 3d at 1013-14.  He notes that courts cite no authority when they recite that terrorists are "unique" in their likelihood of reoffending. *Id.* at 1014-15 ("Repetition of that assertion might give it the ring of truth, but does not make it true.").  The available recidivism data suggests that those with little or no criminal history are not likely to reoffend. *Id.* at 1015.  `"[M]ost importantly," Judge Breyer concluded, "the terrorism enhancement's treatment of criminal history flies in the face of fair, individualized sentencing." *Id.* at 1015-16 (citing and quoting Transcript of Disposition at 69, *United States v. Mehanna*, No. 09-cr-100017 (D. Mass. 2012) (O'Toole, D.J.) (observing that the adjustment is "a fiction," "subversive to the mission of the Guidelines")).

The terrorism enhancement has *not* been applied in approximately twenty recent federal criminal cases arising from protests which involved violent attacks with lit Molotov cocktails or other incendiary devices who targeted police, police vehicles, and government buildings. *See, e.g., United States v. Turzhanskiy*, 12-cr-645 D. Or. 2021 (lit a Molotov cocktail and threw at a police car causing a fire next to the car in a parking lot where police officers were present – guideline range 37-46 months, received a 30 month sentence); *United States v. Floyd*, 17-cr-149

11

(W.D. WA) (constructed explosives and threw them at Seattle police officers with one igniting an officer's trousers causing burns, Floyd later posted online mocking the officers who had been injured during the protest – guideline range 46-57 months, received a 37 month sentence); *United States v. Wolfe*, 20-cr-181 (D. MN) (played a leading role in the near total destruction of the Third Precinct police building by fire in Minneapolis on May 28, 2020, as well as stealing police items from the building including a police vest, duty belt, handcuffs, tactical baton, riot helmet, police radio, pistol magazine, and ammunition – guideline range 41-51 months, sentenced to 41 months); *United States v. Ziegler*, 20-cr-188 (D. MN) (constructed Molotov cocktails that contained sharp objects to thwart efforts to extinguish the fire, broke windows with baseball bats to throw in the explosives that then set fire and caused significant fire and water damage to the Dakota County Western Service Center which contained a courtroom in which *Ziegler* had previously appeared, mandatory minimum of 60 months for arson, sentenced to 60 months); *United States v. David-Pitts*, 20-cr-143 (W.D. WA) (during an August 24, 2020 protest in Seattle, he started a fire at the East Precinct Police Department's sally-port garage door and continued to feed the flames for eleven minutes causing extensive damage to the building as well as throwing a wine bottle at a Seattle police officer – charged with conspiracy to commit arson and a total offense level of 21, sentenced to 20 months); *United States v. Boampong*, 20-cr-10321 (D. MA) (incited panic in downtown Boston by firing 11 rounds in the direction of police officers (one federal) and civilians as a prohibited person in possession of a firearm – not yet sentenced but a Rule 11(c)(1)(C) plea agreement to the range of 42-63 months).  These cases illustrate that much more harmful conduct, against government officials, did not warrant the terrorism enhancement.  The enhancement is not appropriately applied to Ms. Reznicek with the facts of this case.

Another severe consequence of the imposition of the enhancement is the restrictive sentencing conditions that could be imposed if Ms. Reznicek is labeled a "terrorist."[1] The Federal Bureau of Prisons (BOP) operates Communication Management Units (CMUs) that "enables staff to more effectively monitor communication between inmates in CMUs and persons in the community."[2] Such a designation may be made if evidence exists to show the offense conduct included "domestic terrorism." *Id*. at 4. "The volume, frequency, and methods, of CMU inmate contact with persons in the community may be limited." *Id*. at 1. If designated to a CMU, Ms. Reznicek would be limited to corresponding in writing with only one person a week with a six page limit, and two electronic messages a week to a single person. *Id*. at 8, 10. Phone calls would be limited to three 15 minute calls per month with immediate family members only (and no calls on Sunday). *Id*. at 10. In person visitation may also be restricted to immediate family members only. *Id*. at 11. Such restrictions, largely limited to contact with immediate family, would be extremely punitive for Ms. Reznicek who has a strained relationship with her family, but would want to communicate regularly with the Sisters of St. Scholastica Monastery. *See* Ex. A.

The terrorism enhancement is not appropriately applied in this case when looking at all the circumstances and comparative cases. Without the enhancement in PSR ¶ 37, the Adjusted Offense Level in PSR ¶ 40 would be 23, and the Total Offense Level in PSR ¶ 44 would be 20. Ms. Reznicek would be a criminal history category II. The guideline range in PSR ¶ 127 would then be 37 to 46 months.

---

[1] *See* https://www.forbes.com/sites/walterpavlo/2020/10/27/life-inside-federal-prisons-communications-management-unit/?sh=7afec1ba28b8
[2] *See* https://www.bop.gov/policy/progstat/5214_002.pdf

## B. MS. REZNICEK HAS MITIGATING FACTORS TO WARRANT A SENTENCE BELOW THE GUIDELINE RANGE.

On January 6, 2021, Ms. Reznicek formally accepted responsibility by pleading guilty to count one of the indictment, conspiracy to damage an energy facility, pursuant to a written plea agreement. The agreement calls for dismissal of the remaining counts at the time of sentencing, stipulates that the loss amount under the advisory sentencing guidelines exceeds $550,000, and agrees to an order of restitution.

Ms. Reznicek respectfully argues that a sentence below the advisory range is "sufficient" under the 18 U.S.C. § 3553(a) factors, and that the guidelines recommend a "greater than necessary" sentence in this case. In particular, if the terrorism enhancement is applied, Ms. Reznicek is requesting a substantial downward departure or variance because this is an exceptional case and the conduct is outside the heartland of what is normally punished in terrorism offenses. *See* USSG § 5K2.0(a)(3).

This case has been pending for a significant period of time, during which Ms. Reznicek has been granted pretrial supervised release. Ms. Reznicek has been resolute in accepting responsibility for her actions since her confession in July 2017.

This case encapsulates the tale of two people, both named Jessica Reznicek, who have been serving their communities their whole life. The first person was an activist, and as a result has the criminal history to show for it. That activism led her to commit the instant offense. The transformation into the second person has resulted in a conversion of her heart over the last few years, and she is committed to becoming more deeply rooted in spiritual practice and wants nothing more than to return to the Sisters in Duluth to deepen her spiritual journey and serve them and the larger community. Prior to her life in Duluth, Ms. Reznicek did not know that was

possible as a way of life. Both Jessica Rezniceks have been upfront, honest, and forthcoming about their actions. The second person has no criminal history and has landed on a new path, even returning here to the Des Moines Catholic Worker community. Ms. Reznicek had already started therapy and moved to the monastery in March 2019, prior to being indicted in this case. Her transformation was underway of her own volition, not because it was expected of her or would look good to an outside party.

It is rare as a criminal defendant to have the level of support that Ms. Reznicek has received. Obviously some of her support comes from others who share in her belief that the Dakota Access Pipeline is a danger to our environment, but all of the letters in support know Ms. Reznicek as a person and have seen her nurturing and caring nature. Most persuasive, are the people who have come to know Ms. Reznicek since she has committed this offense. This ranges from the Sisters in Duluth, to other community members in Duluth, and newer members of the Catholic Worker community. Without exception, these individuals have singled out the desperate and continuous need that Ms. Reznicek serves in both of these communities. *See* Ex. A.

Ms. Reznicek's formative years laid the foundation for who she has become and what she stands for. She's had a strained relationship with her family over the years and the Raccoon River became a type of mother to her that "nurtured and sustained her." Ex. A at p. 7. She left home at fifteen, and nature was her sanctuary. *Id.* at p. 9. Unquestionably, preserving clean drinking water was paramount to her. She felt immense sadness and grief about what has happened to the environment and that the Raccoon River had become so polluted. Her connection to the importance of clean water led her to start Mississippi Stand, where she attended and spoke at meetings, gathered signatures on petitions, participated in hunger strikes,

15

marches, was arrested for blocking construction equipment, and ultimately committed the instant offense. Ms. Reznicek literally believed she would save lives if they could stop the pipeline.

Ms. Reznicek would not go to those lengths again, her actions and this federal case has changed her focus, she has completely put her activism behind her, and she will be just as devoted to the monastery as she was to her activism. Ms. Reznicek has never shied away from her actions and perhaps unwisely to some, she confessed to her conduct. Given the timeframe of the offenses committed, November 2016 to May 2017, with no arrest made, absent Ms. Reznicek and Ms. Montoya's public confession on July 24, 2017, it is not certain law enforcement would have identified them as the perpetrators.

Ms. Reznicek's love of water and social justice got her involved in a life of service. That has never changed or waivered. After leaving the monastery due to COVID-19, Ms. Reznicek returned to the Catholic Worker house where she focused on daily outreach to support the community. Today, she spends at least ten hours a day tending to our most disadvantaged population, the homeless. She is a leader and supervises a team of people to ensure that 100 people get fed every day.

Because Ms. Reznicek went to the media to confess, word of her arrest, plea, and conviction has traveled far and wide. Ms. Reznicek is not seeking to escape punishment. She acknowledges the crime she committed and understands there are consequences to her actions. However, as this is an unusual case, there ought to be a punishment tailored to the crime. As one letter writer suggested, planting 3,000 trees may not be what this Court has in mind, but something equally creative can be more effective, and have a more positive impact for the community than going to prison. *See* Ex. A at p. 67.

16

Writer after writer in Exhibit A detail Ms. Reznicek's much needed continued service in Duluth at both the monastery and the Damiano Center and for the homeless population here in Des Moines.  Ms. Reznicek does not have a criminal history that shows she will be incorrigible or undeterrable by a sentence below her guidelines.  Her criminal history is overstated when considering that since the age of thirty, her convictions all related to her activism.  With that chapter of her life behind her, there is no reason to believe she will ever commit another offense. Without some rational basis upon which to base a conclusion that she will commit more crimes after she is sentenced, it is reasonable to presume that a felony conviction, restitution, and a sentence of home confinement will have a sufficient impact on reducing her likelihood to reoffend in any manner.  This is absolutely evidenced by the significant changes she has made in her lifestyle since 2017.  Her continued success on pretrial release for over a year and a half shows this to be true.  A prison sentence would not serve as a benefit to anyone.

The felony conviction is a lifetime punishment that will always remind her of her actions. Her word and integrity is all she has at this point, and is the only thing that allows her to sleep at night.  She is constantly working on herself with her therapist and spiritual advisors, and through her work in the community.  Ms. Reznicek's short-term goal is to return to the Sisters of St. Scholastica and her long-term goal is to go to theological school.  Home confinement will allow Ms. Reznicek to care for the Sisters, deepen her spiritual journey, and serve the greater community.  Home confinement will certainly serve as a deterrent effect for both Ms. Reznicek, and those who know of her offense.

Ms. Reznicek is now 39 years old, and will be 40 next month.  The repercussions from her actions will be with her for the rest of her life.  She cannot simply start over.  She will have

this federal felony conviction and the restitution from this case, whatever the ultimate number, which will limit her options going forward.

This case was finally the point where all of Ms. Reznicek's activism came to a head and was a turning point in her life. Those actions were not sustainable long-term and thankfully through the Sisters in Duluth, she has found a new calling and an entirely different lifestyle that does nothing but promote kindness, thoughtfulness, and devotion to others. Mentally and spiritually she has made a near complete conversion. Ms. Reznicek does not want this Court to take her word for it though, the 50 people who wrote in support of her give concrete examples of her character and her transformation.

It was through the St. Scholastica Monastery that Ms. Reznicek started a new way of life. Dr. Elizabeth Anderson, an assistant professor of theology and monastic studies met Ms. Reznicek when she first arrived there. Ms. Reznicek was a "dearly loved member of the monastery community, and brought a vibrancy and joy to its shared life." Ex. A at p. 1. Dr. Anderson details how Ms. Reznicek "has a rare ability to connect with people from all different backgrounds and walks of life" and asks she be able to return to the "monastic community whose presence she so greatly enriched." *Id*. at pp. 1-2. "Jessica gave the community a spark of hope and of joy, and in return they modeled for her patience, wisdom, and prudence." *Id*. at p. 2.

The deepest relationships Ms. Reznicek has developed since her actions at the pipeline, have been with the Sisters of St. Scholastica Monastery. Sister Weber, who became Ms. Reznicek's spiritual director at the monastery, speaks of the social activism that was "very meaningful to her" at one time, but at this stage in her life "she has become more involved in service and growing psychologically and spiritually. She is very sincere in her growth, honesty, and efforts." *Id*. at p. 3.

Ms. Reznicek's duties at the monastery were vast, she worked at the "information desk, working in our gardens, and doing other outdoor work, shoveling snow, visiting our elderly Sisters in our assisted living area (they loved her and she them!), sacristan and communion minister at our Eucharistic celebrations, doing chapel laundry and being greeter at our Sunday Masses. In all of these areas of service and in her very presence, Jessica endeared herself to our community – all 75 of us!" *Id*. at p. 4. Sister Eckes expresses their hope that Ms. Reznicek can return to them because they "need her beautiful presence among us to bring hope, healing, goodness and love to our lives and to the lives of all the people touched by her goodness and human spirit." *Id*. at p. 5.

Ms. Reznicek has learned from her crime and that is seen by those who know her. "It appears to us that, after these life-altering experiences, self-reflection and spiritual growth, Jessica has learned alternative ways to live and care for God's creation and is ready and eager to walk that path in a positive way." *Id*. at pp. 7-8.

The deep desire by Ms. Reznicek to continue to learn, grow, and better herself from this experience is evidenced by the words of Sister Del Monte. "Something that struck me about Jessica is that she was always willing to do any task no matter how big or small, how simple or difficult. She was an incredibly hard worker and approached all with enthusiasm and a willingness to learn and grow." *Id*. at p. 11. "In matters of theology and spirituality she asked deep, meaningful questions, truly seeking to learn and understand, so as to continually become a better person. I believe she found in our community a place where she could continue to learn, grow and deepen her spiritual life. And we have been very enriched by her presence among us." *Id*.

A long-time friend describes Ms. Reznicek as "a woman of deepest integrity and great faith. She has given her whole life to working for and supporting those on the margins – walking with them – and advocating for and protecting the earth, especially water." *Id*. at p. 9.

Ms. Reznicek returned to Des Moines during the pandemic in order to protect the health of many of the elderly sisters at the monastery. She returned to the Catholic Worker house, not as an activist, but as a servant to those in need. Ms. Burbank, who has known Ms. Reznicek since 2013, stated "it has been incredible to see how this process has even further enhanced her spiritual and personal development." *Id*. at p. 13. She is "daily serving, cooking meals, providing friendship and basic necessities to the homeless and children in need. She has only deepened her commitments to self-reflection and her spiritual practices." *Id*.

One of the Sisters eloquently described Ms. Reznicek, "[h]er energy, cheerfulness, and enthusiasm are contagious, and when she had to leave us I felt as if there was a void in our community." *Id*. at p. 14. The Sisters know the crime she has committed and know that those actions "belong to a different person than I saw at our Monastery. Her desire to protect the land and the water is beautiful and familial, but I saw her become more measured, deliberate, and more at peace with herself while here at the Monastery." *Id*. Sister Johnston believes that "any actions she might take in the future to protect our environment will be less impulsive and more considerate of others' property." *Id*. at pp. 14-15.

Many people wrote to describe the activist they knew who they believe sacrificed herself to bring attention to the plight of our water systems. Ms. Reznicek lived the life that many others would not have in order to try and save the environment. During the months she was camped out at the Mississippi River, she had a relationship with law enforcement, and kept up her advocacy after the camp was disbanded. *See* Ex. A at pp. 16-17. Ms. Reznicek "epitomizes a woman of

conviction and determination – someone with integrity of purpose who follows her heart." *Id*. at p. 17. Sister Dewitt has a background of service throughout the world, including a federal prison camp and said, "I have grown well acquainted with the human heart." *Id*. at p. 18. She has seen Ms. Reznicek's personal growth at St. Scholastica and she feels "she is a woman of humor and humility who demonstrated a willingness to mature and the ability to grown in wisdom." *Id*. "I believe the stewardship of her gifts would best be served out of prison rather than burdening society with the cost of her incarceration. We will all be poorer without her among us." *Id*.

A friend of many years who has seen Ms. Reznicek both before and after the offense states that "Jessica has always carried the weight of her actions close to her heart and seeks forgiveness daily for her shortcomings and missteps both large and small. Simultaneously, she lives out her deepest beliefs by helping those around her not out of a sense of duty but instead out of joy." *Id*. at p. 19.

Another stated, "I believe that the Jessica Reznicek I know today will have a positive impact on any community where she chooses to live." *Id*. at p. 20.

"Jessica is not a threat in any shape or form to any part of humanity or to the earth. She is humble and kind. Her heart is brimming over with the best of intentions for every living being." *Id*. at p. 21. "Her love of God and devotion to her Christian path moves my heart and inspires me deeply. Her young life, I hope, will be free to live a contemplative, fully engaged, and active generous life at Monastery." *Id*. at p. 22.

Sister Spinler worked closely with Ms. Reznicek outside and was "impressed with her ability to see things to do without being told and did them; her ability to be caring and friendly with everyone she met and her hunger for a deeper prayer life." *Id*. at pp. 24-25.

Returning to the Catholic Worker house, Ms. Reznicek has helped train some of the new workers in "[c]ooking for 100+ persons, organizing donations, defining healthy boundaries with houseless guests, and adjusting to different ideologies with the community." *Id*. at p. 26. "She has been friend, mentor, counsellor, and, in many ways, a mother to me the past six months." *Id*. "I believe Jess will be a blessing to the downcast and the poor wherever she goes, like she was to me." *Id*.

Another long time Catholic Worker and counselor has witnessed the "transformative process" this case has had on Ms. Reznicek. *Id*. at p. 27. Even awaiting sentencing she "remains open and compassionate to others…volunteer[ing] her time and energy for the homeless in Des Moines." *Id*. He expresses the desire for Ms. Reznicek to "return to her vocation in the convent…so she may live a quiet life of solitude and service to her community." *Id*.

Ms. Reznicek's social activism came from long and deeply held beliefs about protecting our waterways. Ms. Reznicek's passion was deeper than just showing up for a protest, she tried to educate those she came into contact which included "farmers, pastors, law enforcement, and like-minded visitors" at the Mississippi river. *Id*. at p. 28. She shared stories and the "conversations were healing – a gift to landowners and to families." *Id*. Ms. Reznicek was a constant presence who had a "very positive impact on landowners and neighbors in SE Lee County. She even developed good relationships with local law enforcement officials." *Id*. at p. 37.

Ms. Reznicek is a deeply caring person who "reminds me to see the beauty in the world" and who literally gives "her shoes or other articles of clothing because she found someone who needed them more that day" and gave her "backpack to an unhoused person who was crying. She explained that she just hoped it would brighten their day." *Id*. at p. 30. "I would not be

exaggerating to say that she changes a life on almost a daily basis with her kindness, generosity and love." *Id*. at p. 31.

Serving people suffering from poverty, homelessness, and with mental illness is more than just filling up their plates at meal times. Ms. Reznicek puts herself in harm's way when she intercedes when fights break out between the guests and she has the ability to quickly deescalate the situation by, "talk[ing] soothing words, and takes the guest by the hand and walks them down the block to calm them down." *Id*. at p. 36.

Ms. Reznicek has served the poor throughout the country and the world. A 76-year-old who works with at risk teens in California wrote in support of Jessica (which he has never done for anyone before) to say, "[i]n the 44 years I have been living and working with the very poor, Jessica Reznicek is the most memorable person I have run across." *Id*. at p. 41. "This woman is a FORCE for life and life in abundance." *Id*.

Stepping away from activism and turning toward the monastic life is the "next step in her journey. To me, she seemed to be feeling frustrated with the lack of lasting change activism was bringing and has found that fulfillment by exploring spirituality more deeply." *Id*. at p. 31.

As recently as last month Ms. Reznicek went to private retreat for a week at Prairiewoods Franciscan Spirituality Center in Hiawatha, Iowa to pray and reflect in the quiet solitude of a hermitage in the wooded area of the property. She met daily with the spiritual director, Sister Ann Jackson who helped Ms. Reznicek place herself freely before God and to reflect on her life experiences.

The Sisters of St. Scholastica Monastery pray for and want Ms. Reznicek to return to the Benedictine community, with one saying she "believe[s] that her gifts, her compassionate nature and her deep faith are signs of her calling to religious life in this community." *Id*. at p. 33. The

23

deep spiritual journey that the Sisters of St. Scholastica have afforded Ms. Reznicek has left her with "no interest in participating in future illegal actions that could jeopardize for her that way of life, which has brought her so much joy and peace." *Id*. at p. 43. "Jessica has found her calling with this monastic community, and has found a new, more stable path in which to pour her passion and energy." *Id*.

A former chaplain, campus minister, and coordinator of religion for the Iowa Department of Corrections knows Ms. Reznicek as a "deeply committed woman with high ideals." *Id*. at p. 34. "She is honest with herself and others and makes no excuses for her actions. She does not blame others for her experiences." *Id*.

Many people strive in their work so that they can live comfortable lives. Being comfortable is not something Ms. Reznicek is familiar with. Her life has been dedicated to providing comfort to others, while she makes sacrifices in her daily life. She has done this for years and years. Many of those years it resulted in sleeping on the ground, camping out, and using her body physically to protest injustices. It also resulted in being arrested and placed in uncomfortable jail cells.

One Catholic Worker writes, "I wonder why I don't have the inspiration to do more to get the water, soil and air clean again. We need people like Jessica who can continually remind us that we, as brothers and sisters, can do better." *Id*. at p. 44.

Ms. Reznicek is obviously not a martyr, she went too far in committing this crime, but the backbone of what she believes in remains true. The difference is, she has completely changed her life to serve others in a non-activist role. She still believes that water is life. She still wants to protect the environment, but she has a new way to do that; a way that she did not realize existed until she visited the monastery in 2018.

Her continued rehabilitation would most effectively occur in her continued service to the community. "Rehabilitation usually occurs when there is a community of healthy support for a person. Jessica would have that in Duluth through her relationships with the Sisters and other good friendships she has made there." Ex. A at p. 3. Sister Eckes also voices the community support that Ms. Reznicek has which will keep her from reoffending. *Id*. at p. 6. "Every community of which Jessica is a part is the better for her having simply been part of it." *Id*. at p. 12.

The question for the Court is whether a punitive sentence is "necessary" for Ms. Reznicek for her conduct. Ms. Reznicek, and many people who know her well, submit a custodial sentence is not necessary to meet the goals of sentencing in this case. While the scope of this offense is serious, Ms. Reznicek has no criminal history that has ever risen to this level before. A sentence to incarceration would be detrimental to the community. "Sending Jessica to prison would deprive many of her amazing gifts to build up others, both as individuals, and as a community of the beloved making a positive impact in our world." *Id*. at p. 12. "Jessica is too valuable a human being to incarcerate. Her gifts, passions, and love belong at the service of her community day in and day out." *Id*. at p. 29.

One colleague's words sums up all of these letters in one sentence: "I need her, her housemates need her, the guests at the Worker need her, the people of Des Moines whom she feeds need her, the nuns of Duluth need her, the children of the Damiano center need her, and the community at large needs her. *Id*. at p. 36.

It takes a concerted effort on a daily basis to live a life that is different than what she had been living for decades. Lengthy incarceration will only serve to stunt the progress that Ms. Reznicek has made, and will keep the victim from seeing any restitution for years to come.

25

Ms. Reznicek is no danger to the community such that there is no choice but to imprison her to protect society. All of the letters confirm it is quite the opposite. She is a benefit to society in the current work she has been, and continues to do. The large sum of restitution in this case is a severe punishment for her behavior.

The Court can fashion a sentence that contains an ample degree of additional punishment, without imprisoning Ms. Reznicek for a lengthy period, in an environment that poses increased danger to her. *See Gall v. United States*, 552 U.S. 38, 48 at n.4 (2007) (citing N. Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999) (noting that "the probation or parole conditions imposed on an individual can have a significant impact on both that person and society")). The additional benefit of imposing a sentence emphasizing supervision over incarceration, is that Ms. Reznicek can work toward her restitution obligations faster, and more effectively, than she can within the Bureau of Prisons, while still being subject to substantial restrictions on her liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987))). Ms. Reznicek would agree to whatever restrictions or conditions the Court wishes to impose.

The danger of incarceration is especially true in the context of the current global pandemic where prison has become even more punitive and less correctional and rehabilitative. The Federal Bureau of Prisons is overcrowded—beyond capacity in some places—and conditions at the facilities make it impossible for inmates to effectively self-care to minimize their risks of infection. Jails and prisons are some of the most dangerous environments for the spread of COVID-19. Additionally, there is virtually no programming being offered due to the pandemic.

The ultimate question before the Court is how much punishment is "sufficient" for Ms. Reznicek. While her crime is serious, she has accepted responsibility for it, has diligently worked on herself daily while also serving the greater community, and is committed to making restitution in the future.

Her excellent performance on supervision, and the consequences yet to be imposed, are sufficient to form a just punishment that reflects the seriousness of the offense, while providing adequate deterrent force. No unwarranted sentencing disparity will result from imposing a below-guideline sentence given the nature and circumstances of this case, particularly when Ms. Reznicek's history and characteristics are taken into account. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). Further, the world is suddenly much different than it was when this case commenced, and the Court must take that into account when assessing what total and type of punishment is "sufficient, but not greater than necessary" in this case. 18 U.S.C. § 3553(a).

WHEREFORE, considering the sentencing factors within section 3553(a), Ms. Reznicek respectfully requests that the Court sentence her below her guideline range to probation or time-served with home confinement.

Respectfully submitted,

 /s/ Melanie S. Keiper
MELANIE S. KEIPER, Assistant Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610  FAX: (515) 309-9625
E-MAIL: melanie_keiper@fd.org

/s/ William Quigley
WILLIAM QUIGLEY
7214 St. Charles Avenue, Campus Box 902
Loyola University New Orleans College of Law
New Orleans, LA  70118
PHONE:  (504) 710-3074
E-MAIL:  quigley77@gmail.com

ATTORNEYS FOR THE DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2021, I electronically filed this document with the Clerk of Court using the ECF system, which will serve it on the appropriate parties via their email address(es) of record.

/s/ Morgan Conn, Paralegal